AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
MAR 06 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One White/Silver Huawei Cellular Telephone
IMEI: 865584022653445
(Target Telephone 7)

Case No. **19MJ0965**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-7

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-7

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1), 846 | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:
See attached affidavit of Drug Enforcement Administration Special Agent Ross Van Nostrand.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ross Van Nostrand, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/6/19

*Judge's signature*

City and state: San Diego, California                Hon. Linda Lopez, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A-7

PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violations of Title 21, United States Code, Sections 841(a)(1), 846 is described below:

One White/Silver Huawei Cellular Telephone
IMEI: 865584022653445

("**Target Telephone #7** or **TT7**"). Agents seized **Target Telephone #7** from Andres ORTIZ-Torres' vehicle incident to Luis SANDOVAL-Lares' arrest on February 6, 2019. Post-arrest, SANDOVAL-Lares admitted that **Target Telephone #7** belong to him. **Target Telephone #7** is currently in possession of the Drug Enforcement Administration, San Diego Field Office, located at 4560 Viewridge Ave., San Diego, California 92123.

## **ATTACHMENT B-7**

### ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A-7 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. The seizure and search of the cellular telephone will be conducted in accordance with the procedures outlined in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of December 1, 2018, to February 7, 2019:

a. tending to indicate efforts to distribute methamphetamine, heroin, cocaine, or some other controlled substances in the Southern District of California and throughout the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of methamphetamine, heroin, cocaine, or some other controlled substances in the Southern District of California and throughout the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in distribution of methamphetamine, heroin, cocaine, or some other controlled substances in the Southern District of California and throughout the United States;

d. tending to identify travel to or presence at locations involved in the distribution of methamphetamine, heroin, cocaine, or some other controlled substances in the Southern District of California and throughout the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of Title 21, United States Code, Sections 841(a)(1), 846.**

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Ross Van Nostrand, Special Agent with the Drug Enforcement Administration, having been duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following cellular telephones (collectively, "**Target Telephones**"):

    a. One Silver Apple iPhone, Model: A1586, IMEI: 352031076804904, seized from Alberto ARELLANO's vehicle incident to his arrest on February 6, 2019 ("**Target Telephone 1**" or "**TT1**"), as described further in Attachment A-1, which is incorporated by reference herein;

    b. One White/Silver Apple iPhone with a black Dolce Gabbana case, IMEI: 357207090017948, seized from Alberto ARELLANO's vehicle incident to his arrest on February 6, 2019 ("**Target Telephone 2**" or "**TT2**"), as described further in Attachment A-2, which is incorporated by reference herein;

    c. One Silver Apple iPhone with red case, Model: A1549, IMEI: 354410067523319, seized from Alberto ARELLANO's vehicle incident to his arrest on February 6, 2019 ("**Target Telephone 3**" or "**TT3**"), as described further in Attachment A-3, which is incorporated by reference herein;

    d. One Samsung Silver/Black Cellular Telephone, Model: SMJ327T1, IMEI: 359479090577589, seized from Alberto ARELLANO's vehicle incident to his arrest on February 6, 2019 ("**Target Telephone 4**" or "**TT4**"), as described further in Attachment A-4, which is incorporated by reference herein;

    e. One Silver/Black LG Cellular Telephone, Model: LGL59BL, IMEI: 354343080616903, seized from Alberto ARELLANO's vehicle incident to his arrest on February 6, 2019 ("**Target Telephone 5**" or "**TT5**"), as described further in Attachment A-5, which is incorporated by reference herein;

1

        f.      One red Apple iPhone IMEI: 353059102368528, seized from Andres ORTIZ-Torres' vehicle incident to his arrest on February 6, 2019 ("**Target Telephone 6**" or "**TT6**"), as described further in Attachment A-6, which is incorporated by reference herein:

        g.      One white/silver Huawei Cellular Telephone, IMEI: 865584022653445, seized from Andres ORTIZ-Torres' vehicle incident to his arrest on February 6, 2019 ("**Target Telephone 7**" or "**TT7**"), as described further in Attachment A-7, which is incorporated by reference herein:

        h.      One Blue Samsung Cellular Telephone with black case, Telcel SIM:8952020216, seized from Felix ORTEGA-Naranjo incident to his arrest on February 6, 2019 ("**Target Telephone 8**" or "**TT8**"), as described further in Attachment A-8, which is incorporated by reference herein,

and seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 841(a)(1), 846 as outlined in Attachments B-1 through B-8.

        2.      This search supports an investigation into Alberto ARELLANO, Andres ORTIZ-Torres, Luis SANDOVAL-Lares, and Felix ORTEGA-Naranjo, following their arrest for Conspiracy to Distribute Controlled Substances on February 6, 2019. The **Target Telephones** were seized from the aforementioned individuals during their arrest. The **Target Telephones** are currently being stored as evidence at the Drug Enforcement Administration, San Diego Field Office, located at 4560 Viewridge Avenue, San Diego, CA 92123.

        3.      Based on the information below, there is probable cause to believe that a search of the **Target Telephones** will produce evidence of the aforementioned crimes, as described in Attachments B-1 through B-8.

        4.      The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and

my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Telephones**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5. I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is an officer of the United States who is empowered by the law to conduct investigations of and to make arrests for the offenses enumerated in Title 21 United States Code and other felony offenses.

6. I am a Special Agent employed by the United States Drug Enforcement Administration (DEA), and have been so employed since June 24, 2018. I am currently assigned to the San Diego Field Division's Narcotic Task Force team which is comprised of personnel from the DEA, San Diego Police Department, San Diego County Sheriff's Office, and Chula Vista Police Department. I have received approximately 16 weeks of training at the DEA Academy in Quantico, Virginia. During that training, I learned how criminal enterprises are structured and how they operate. I also learned how controlled substances are manufactured, consumed, packaged, marketed and distributed. I have had formal and informal training and experience in controlled substances investigations; I have become familiar with the manner in which controlled substances, are produced, trafficked, distributed and consumed. I have received training in the identification of all types of controlled substances by sight and odor.

7. Prior to being employed by the DEA, I was employed as a Police Officer in New Haven, Connecticut for approximately 9.5 years. During my tenure as a Police Officer, I have participated in numerous criminal investigations involving

3

homicides, shootings, robberies, burglaries, assaults, and drug violations. I have written and executed search warrants, which have resulted in the seizure of illegal drugs and drug violations. As a law enforcement officer, I have received formal training, as well as on-the-job experience and training, relative to the investigation of the importation, transportation, sales, manufacturing and distribution of controlled substances. I have also participated in investigations which involved the use of electronic surveillance techniques.

8. Over the past 10 years in law enforcement, I have also participated in undercover operations which involved the sale and purchase of controlled substances and illicit narcotics. I have participated in investigations in which drug traffickers also relied heavily upon telephone communication and other electronic devices as a means of communicating with their associates, confidential informants, cooperating individuals and undercover officers. I have interviewed individuals that have been directly and indirectly involved in the importation, transportation, distribution and manufacturing of illegal drugs, and controlled substances.

9. Based on my training and experience, I have become familiar with the methods utilized in narcotics trafficking operations and the unique trafficking patterns employed by drug trafficking organizations ("DTOs"). I have also spoken with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations and the language and patterns of drug abuse and trafficking. With this training and experience I have become knowledgeable about the methods employed by drug traffickers to conduct their illegal activities.

10. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by

4

utilizing cellular telephones to maintain communication and location information with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distribution amount quantities of controlled substances, such as cocaine, methamphetamine, and heroin. Typically, load drivers smuggling controlled substances across the border are in telephonic contact with co-conspirators immediately prior to, during and following the crossing of the narcotic load, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. From my training and experience, I am aware that narcotics smugglers and their organizations use cellular, digital, and satellite telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular, digital, and satellite telephones.

11.   Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a.   Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b.   Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c.   Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

   d.   Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e. Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f. Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

12. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

a. tending to indicate efforts to distribute methamphetamine, heroin, cocaine, or some other controlled substances in the Southern District of California and throughout the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of methamphetamine, heroin, cocaine, or some other controlled substances in the Southern District of California and throughout the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in distribution of methamphetamine, heroin, cocaine, or some other

6

controlled substances in the Southern District of California and throughout the United States;

  d. tending to identify travel to or presence at locations involved in the distribution of methamphetamine, heroin, cocaine, or some other controlled substances in the Southern District of California and throughout the United States, such as stash houses, load houses, or delivery points;

  e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

  13. Beginning in July of 2018, members of the DEA San Diego's Narcotics Task Force (NTF) in collaboration with DEA Memphis Resident Office received information regarding a Mexico-based drug trafficking organization. Agents obtained information that a Tijuana, Baja California, Mexico-based distributor was sending kilogram quantities of methamphetamine, heroin, cocaine, and fentanyl.

  14. In August 2018, DEA San Diego NTF agents utilized a Confidential Source (CS-1)[1] to conduct controlled purchases of methamphetamine and heroin. First, on August 8, 2018, Alberto ARELLANO ("ARELLANO") provided CS-1 with approximately one pound of methamphetamine in National City, CA. ARELLANO fronted the methamphetamine to CS-1. ARELLANO coordinated the

---

[1] CS-1 began cooperating with investigators in 2018 in exchange for consideration regarding state of Tennessee drug charges. The information provided by CS-1 in this case is considered reliable because, in part, it has been corroborated by physical surveillance, records checks, recorded communications, and drug seizures. CS-1 is not currently receiving monetary compensation in exchange for his/her continued cooperation. No other forms of consideration or inducements have been requested by, or offered to, CS-1. CS-1 has a limited criminal history and this was CS-1's first drug-related arrest.

7

transaction with CS-1 a cellular telephone. CS-1 told ARELLANO that the methamphetamine was destined for Memphis, Tennessee.

15. In September 2018, again DEA San Diego NTF team used CS-1 to conduct a controlled purchase of heroin. On September 11, 2018, Andres ORTIZ-Torres ("ORTIZ-Torres") provided CS-1 with approximately 1.5 kilograms of suspected heroin in exchange for $25,000.00. CS-1 told ORTIZ-Torres that the heroin was destined for Memphis, Tennessee.

16. As a result of the investigation, on January 9, 2019, a Grand Jury in the Western District of Tennessee indicted ARELLANO and ORTIZ-Torres for violating Title 21, United States Code, Sections 841(a)(1), 846. Arrest warrants for ARELLANO and ORTIZ-Torres were issued.

17. In furtherance of this investigation, DEA San Diego NTF agents obtained state search warrants for ARELLANO's residence (5160 Emerald Cove, Chula Vista, CA) and ORTIZ-Torres' residence (1954 Ridgewood Drive, San Diego, CA).

18. On February 6, 2019, DEA NTF agents developed a systematic plan in order to execute both arrest warrants and search warrants for ARELLANO and ORTIZ-Torres. The plan was to conduct a final controlled purchase using CS-1. On the same day, agents concurrently established surveillance on the aforementioned locations.

19. While surveilling 1954 Ridgewood Drive, San Diego, CA, at approximately 10:40 am, agents observed ORTIZ-Torres and an unidentified male, subsequently identified as Luis Gilberto SANDOVAL-LARES ("SANDOVAL-LARES"), depart the residence. Agents saw Ortiz-Torres and SANDOVAL-LARES each place an item in the trunk of a white Dodge Charger bearing California license plates. Ortiz-Torres and SANDOVAL-LARES then entered the vehicle with Ortiz-Torres driving and SANDOVAL-LARES as a passenger.

20. Agents observed the Dodge Charger as it drove to Las Americas Outlet Mall located at 4211 Camino De La Plaza, San Ysidro, California. At approximately 11:00 am, agents saw Ortiz-Torres and SANDOVAL-LARES exited the Dodge Charger and entered the Nike store. At approximately 11:04 am, Ortiz-Torres and SANDOVAL-LARES exited the Nike store with SANDOVAL-LARES carrying an orange-colored bag which he placed in the trunk of the Charger. The Dodge Charger, again driven by Ortiz-Torres, then moved to the rear of the Plaza Las Americas parking lot where agents temporarily lost sight of it. Agents then reacquired sight of the vehicle as it again parked in a space at Las Americas Outlet Mall near the McDonald's restaurant, where Ortiz-Torres and SANDOVAL-LARES remained in the vehicle for approximately twenty minutes.

21. After twenty minutes, agents observed a second unidentified male, subsequently identified as Felix ORTEGA-Naranjo ("ORTEGA-Naranjo"), approach the Charger, and enter the rear seat of the vehicle. ORTIZ-Torres, SANDOVAL-LARES, and ORTEGA-Naranjo then departed the parking lot in the Charger. Agents observed the Charger depart the area and travel northbound on Interstate 805, where the vehicle exited at East H Street in Chula Vista, CA, and began traveling east. At approximately 11:50 am, agents saw the Dodge Charger enter the Terra Nova Shopping Plaza located at 394 East H Street, Chula Vista, California. Agents observed ORTEGA-Naranjo exit the vehicle carrying a black backpack. Notably, ORTEGA-Naranjo was not previously carrying this backpack when he entered the Charger in the Los Americas parking lot. ORTIZ-Torres and SANDOVAL-LARES remained in the vehicle and departed the area. Agents temporarily lost sight of ORTEGA-Naranjo. At approximately 12:20 pm, agents located ORTEGA-Naranjo still carrying the black backpack and walking westbound on East H Street, Chula Vista, California.

22. While walking down the sidewalk, ORTEGA-Naranjo called CS-1 and was coordinating a location to meet the source to provide narcotics to the source. ORTEGA-Naranjo identified his location and asked where the source was. The source relayed his/her conversation with ORTEGA-Naranjo to agents. Agents also observed ORTEGA-Naranjo talking on his cellphone and approached him and arrested him. Incident to ORTEGA-Naranjo's arrest, agents searched the backpack and found two packages containing approximately 1048 grams of suspected methamphetamine and one package containing approximately 1129 grams of suspected heroin. Agents found **TT8** on ORTEGA-Naranjo's person, which was seized.

23. Agents also located the Dodge Charger and arrested SANDOVAL-LARES and ORTIZ-Torres. A search of the Dodge Charger yielded a red iPhone **(TT6)** in the front driver side of the vehicle. **TT6** has a background photo of ORTIZ-Torres and his child. Also in the front vehicle area, **TT7** was located. Both SANDOVAL-LARES and ORTEGA-Naranjo are facing prosecution for violating 21 U.S.C. §§ 841, 846 (Conspiracy to Distribute Methamphetamine and Heroin) in the Southern District of California in case no. 19MJ0532-JLB. Post-arrest, both SANDOVAL-LARES and ORTIZ-Torres waived their *Miranda* rights and gave post-arrest statements. ORTIZ-Torres admitted that **TT6** belonged to him. Likewise, SANDOVAL-LARES admitted that **TT7** was his.

24. While agents were conducting surveillance on 1954 Ridgewood Drive, other agents concurrently conducted surveillance at ARELLANO's residence at 5160 Emerald Cove, Chula Vista, CA. Agents observed ARELLANO depart this address in a white GMC bearing California license plates. Agents maintained surveillance on ARELLANO as he drove to the Dick's Sporting Goods Store located at 390 East H Street, Chula Vista, CA where he was subsequently arrested based on the arrest warrants from the Western District of Tennessee. Agents searched

ARELLANO's vehicle and found approximately three pounds of suspected cocaine inside. Agents also found a black satchel in the front area of the vehicle which contained various paper documents and **Target Telephones 1 through 5** belonging to ARELLANO.

25. Agents subsequently executed search warrants at 5160 Emerald Cove, Chula Vista, CA and 1954 Ridgewood Drive, San Diego, CA. A search of ARELLANO's residence revealed approximately 1 kilogram of suspected cocaine, approximately 1 pound of suspected heroin, approximately 80.5 grams of suspected methamphetamine, and approximately 32.5 grams of suspected ecstasy.

26. Based upon my training and experience investigating drug trafficking organizations, as well as the training and experience of other agents experienced in narcotics trafficking methods, I believe that ORTIZ-Torres, SANDOVAL-LARES, ORTEGA-Naranjo, and ARELLANO likely used the **Target Telephones** to coordinate the conspiracy to distribute controlled substances. Based on my training and experience in investigating narcotics offenses, I believe that it can take several months to coordinate and develop contacts to carry out a scheme to distribute narcotics. I also know that ARELLANO and ORTIZ-Torres have been distributing pound quantities of narcotics since at least August 2018. I therefore respectfully request permission to search **Target Telephones 1 through 6** from August 1, 2018, up to and including February 7, 2019. It is unknown how long SANDOVAL-LARES (**TT7**) and ORTEGA-Naranjo (**TT8**) have been involved with distributing narcotics with ORTIZ-Torres. In my training and experience, I know that coordination and planning can take several months. Additionally, the quantity of heroin and methamphetamine distributed by SANDOVAL-LARES and ORTEGA-Naranjo is worth approximately $20,000, and this quantity shows a level of trust in the organization based on prior contacts, planning, and possibly other drug transactions.

I therefore respectfully request permission to search **Target Telephones 7 and 8** for data beginning December 1, 2018, up to and including February 7, 2019.

27. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of the **Target Telephones** which may identify other persons involved in narcotics trafficking activities. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics trafficking activities of ORTIZ-Torres, SANDOVAL-Lares, ORTEGA-Naranjo, and ARELLANO such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Telephones**.

## METHODOLOGY

28. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not

have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, I will collect the subject cellular/mobile telephones and subject them to analysis. All forensic analysis of the data contained within the telephones and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

31. Based on all of the facts and circumstances described above, there is probable cause to conclude that ORTIZ-Torres, SANDOVAL-Lares, ORTEGA-Naranjo, and ARELLANO used their respective **Target Telephones** to facilitate violations of Title 21, United States Code, Sections 841(a)(1), 846. The **Target Telephones** were likely used to facilitate the offenses by transmitting and storing data, which constitutes evidence of these violations.

13

32. Because the **Target Telephones** were promptly seized during the aforementioned arrests and have been securely stored, there is probable cause to believe that evidence of the aforementioned criminal activity committed by ORTIZ-Torres, SANDOVAL-Lares, ORTEGA, and ARELLANO continues to exist on the **Target Telephones**.

WHEREFORE, I request that the court issue a warrant authorizing DEA Special Agents and/or other federal and state law enforcement officers to search the items described in Attachments A-1 to A-8, and the seizure of items listed in Attachments B-1 to B-8 using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

/s/ Ross Van Nostrand
Ross Van Nostrand
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this ⁶ day of March, 2019.

HONORABLE LINDA LOPEZ
UNITED STATES MAGISTRATE JUDGE